[Docket Nos. 57 & 58]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

**CAMDEN VICINAGE**

```
JOHN BRANDT,
                Plaintiff,          Civil No. 06-0923 (RMB)

        v.

LYDA MONTE, et al.,                 OPINION

                Defendants.
```

Appearances:

Andrea Janis Waye
Kira Feeny Spaman
Kit Applegate
Stephen M. Orlofsky
      Blank Rome LLP
      Woodland Falls Corporate Center
      210 Lake Drive East, Suite 200
      Cherry Hill, NJ 08002
          Attorneys for Plaintiff

Gerard Andrew Hughes
      Office of the New Jersey Attorney General, Division of Law
      25 Market Street
      Post Office Box 112
      Trenton, NJ 08625-0112
          Attorney for Defendants

**BUMB,** United States District Judge:

John Brandt (the "Plaintiff"), who was an involuntarily

committed patient at Ancora State Psychiatric Hospital ("Ancora")

from September 2005 to September 2006,[1] brought this lawsuit alleging that state medical authorities violated his civil rights when they forcibly administered antipsychotic medication to him, first, pursuant to an emergency declaration and later, pursuant to a non-emergency procedure.  He is now involuntarily committed at Ann Klein Forensic Center, another state hospital.

The treating physician at Ancora, psychiatrist Lyda Monte, and Ancora "treatment team" members Regina O'Connell, a psychologist, Doris Simmerman, a social worker, and John Coffee, a program coordinator, (collectively, the "Ancora Defendants") are all alleged to have had a personal role in the decision to medicate Plaintiff and are therefore sued in their individual capacities.[2]  La Tayna Wood El, Ancora's chief executive officer, Kevin Martone, assistant commissioner for the New Jersey Division

---

[1] During this period, Plaintiff was discharged for ten days in November 2005.

[2] The Second Amended Complaint states that the Ancora Defendants are also named in their official capacities.  (2d Am. Compl. 3, ¶ 7.)  However, Plaintiff appears to retreat from this position in his opposition brief to Defendants' motion for summary judgment.  (Pl. Opp'n Br. 39-40 (stating that the Ancora Defendants are sued in their individual capacities and the State Defendants (described below) are sued in their official capacities).)  State officers named in their official capacities can be sued only for injunctive relief, not damages.  Edelman v. Jordan, 415 U.S. 651, 666-67 (1974).  Since Plaintiff is no longer a patient at Ancora, he lacks standing to seek injunctive relief from Ancora officials.  Los Angeles v. Lyons, 461 U.S. 95, 111 (1983).  Therefore, the Court will construe the Second Amended Complaint as alleging only individual capacity claims for damages against the Ancora Defendants.

2

of Mental Health Services, Kevin Ryan, former commissioner of the New Jersey Department of Human Services, James Smith, former acting commissioner of the New Jersey Department of Human Services, and Anthony Haynes, the "Rennie Advocate" at Ancora, (collectively, the "State Defendants") are sued in their official capacities for injunctive relief.

Plaintiff now moves for partial summary judgment, contending that Defendants' undisputed conduct violated his constitutional rights as a matter of law.  Defendants cross-move for summary judgment on the grounds, inter alia, that they are immune from suit pursuant to the doctrines of qualified and sovereign immunity.  For the reasons stated herein, the Court denies Plaintiff's motion for partial summary judgment, and, in part, grants Defendants' cross-motion for summary judgment.

**I. Statement of Facts**

**A. Background**

Plaintiff has had a long history of psychological illness, which, at times, has manifested itself in violent and unlawful behavior.  In 2003, Plaintiff was found not guilty by reason of insanity for criminal charges of burglary, criminal mischief, and criminal trespass as a result of breaking in to his ex-girlfriend's college dormitory room and, in the midst of a dispute with her, destroying her property.  He was thereafter involuntarily committed at Ancora, a psychiatric hospital.

3

This case arises from an incident at Ancora.  In November
2005, Plaintiff was placed in Ancora's Medical Ward to receive
treatment for an injury to his leg.  His treating doctor, Cecilia
Caringal, concluded that he should not be involuntarily committed
because he suffered only from an impulse control disorder, an
"Axis II" diagnosis, rather than the "Axis I" diagnosis that
would normally justify involuntary commitment.[3]  In February
2006, on Caringal's recommendation, a state commitment court
ordered that Plaintiff be transferred from the Medical Ward, that
his "treatment team may begin a discharge plan if deemed
appropriate," and that he "cooperate with his treatment team and
take any medications prescribed by the treating psychiatrist . .
. ."  (Pl. Stat. Mat. Fcts. 4-5, ¶ 21.)  Pursuant to the
commitment court's order, the Medical Ward staff prepared
paperwork recommending that Plaintiff be discharged and that his
privileges be elevated.  Before the recommendation could be acted
upon, however, Plaintiff was transferred from the Medical Ward to
Holly Hall C and placed under the care of the ward psychiatrist,

---

[3] Defendants do not dispute that Caringal recommended
upgrade and discharge for Plaintiff, but nonetheless contend that
Caringal's observations of Plaintiff's behavior were at odds with
"all the other psychiatrists who treated him over the years."
(Def. Stat. Mat. Fcts. 11-12, ¶ 30.)  Defendants speculate that
Plaintiff's tranquil demeanor during the period under Caringal's
supervision may have been attributable to the pain medication he
was taking for his leg injury.  Id.  However, Plaintiff contends
that he was prescribed pain medication only for the first two
weeks under Caringal's care.  (Pl. Ctr-Stat. Mat. Fcts. 7, ¶ 30.)

Ancora Defendant Monte.  The treatment team in Holly Hall C consisted of Ancora Defendants O'Connell, Simmerman, and Coffee, as well as nurse Deborah Berkebile.

The record is unclear as to whether the treatment team in Holly Hall C was aware of the Medical Ward's upgrade and discharge recommendations.[4]  The morning that Plaintiff was transferred, on February 9, he met with Monte and the treatment team for a routine intake interview, at which time Monte prescribed antipsychotic medication.  Plaintiff, aware of the Medical Ward team's recommendation, believed he did not need antipsychotic medication and refused to consent to administration of the drugs.  In the treatment team meeting, Plaintiff grew increasingly agitated.  He raised his voice, and at one point left the room.  After the meeting's abrupt conclusion, Monte completed a certificate that declared Plaintiff to be an "emergency" and ordered that he be medicated intravenously without his consent.  She prescribed Topamax, Vistaril, Zyprexa, and Benadryl.  On the "Emergency Certificate," she provided this basis for the emergency declaration:

---

[4] This is a disputed question of material fact.  Plaintiff points to Coffee's deposition testimony in support of his contention that the Holly Hall C team was not aware of the Medical Ward team's recommendation.  (Pl. Stat. Mat. Fcts. 6, ¶ 26.)  Defendants do not dispute that Coffee so testified, but nonetheless assert that Monte did know about the Medical Ward team's recommendation, as well as the commitment court's February 7 order.  (Def. Ctr-Stat. Mat. Fcts. 5, ¶ 26.)

> HOSTILE, AGGRESSIVE, ANGRY, REFUSING TO TAKE MEDS, IMPULSIVE, LONG HX [HISTORY] OF AGGRESSIVE/ASSAULTIVE/CRIMINAL BEHAVIOR, EXTREMELY MANIPULATIVE – HAS COURT ORDER TO COMPLY WITH PRESCRIBED MEDICATION – VERY CONFRONTATIONAL WITH HIGH LEVEL OF AGITATION AND HOSTILITY – HX [HISTORY] OF 2 ESCAPES FROM GPPH [GREYSTONE PARK PSYCHIATRIC HOSPITAL] – KROL STATUS.

(Pl. Stat. Mat. Fcts. 8, ¶ 37.)  In addition to the Emergency Certificate, Monte put Plaintiff on "one-to-one precautions," which requires a hospital staff member to be within an arm's length of the patient at all times and to keep a log noting the patient's behavior every fifteen minutes.

Medication was administered to Plaintiff pursuant to the Emergency Certificate only twice.  At Ancora, drugs are routinely administered twice daily, at 8:00 a.m. and 8:00 p.m.  Thus, Plaintiff's first emergency administration occurred at 8:00 p.m., almost nine hours after his encounter with the Ancora Defendants; the second emergency administration occurred at 8:00 a.m. the following morning.

That morning, Monte initiated the three-step Non-Emergency Procedure for medicating a patient involuntarily.  By noon, this procedure had been completed.  Thus, although Plaintiff continued to be medicated against his will, starting with the second day's evening administration, he was medicated pursuant to the Non-Emergency Procedure.  The one-to-one precaution log, which documented Plaintiff's behavior for the entire 25-hour period of the Emergency Certificate, did not note any aggressive or

6

otherwise abnormal behavior.

**B. Administrative Bulletin 78-3 (Rules for Involuntary Administration of Medication)**

Administrative Bulletin 78-3 sets out the procedures that New Jersey state hospitals must follow for forcibly medicating involuntarily committed patients.  It deals with the administration of medication in both emergency and non-emergency situations.  Indeed, Administrative Bulletin 78-3 was the subject of extensive litigation between 1977 and 1983, when the Third Circuit ultimately upheld its procedure for non-emergency forcible medication.  That Third Circuit decision, <u>Rennie v. Klein</u>, discussed more fully below, held that the non-emergency procedure, which requires three levels of approval before patients may be forcibly medicated, struck a constitutionally appropriate balance by protecting the patient's liberty interest in refusing medication, while still allowing medical authorities to administer medication as needed.  720 F.2d 266, 269-270 (3d Cir. 1983).

Section IV(A) of Administrative Bulletin 78-3 provides that medical authorities may administer psychotropic medication only when patients have given voluntary, informed consent.  The Bulletin outlines four exceptions to this consent requirement: (1) emergency administration of medication (the "Emergency Procedure"), (2) non-emergency refusal to give consent (the "Non-Emergency Procedure"), (3) patients incapable of giving informed

7

consent, and (4) incompetent patients.[5]  (As there is no dispute
that Plaintiff was competent and capable of giving informed
consent, only the Emergency Procedure and the Non-Emergency
Procedure are at issue in this case.)

In relevant part, the Emergency Procedure requires a
treating physician to certify "that it is essential to administer
psychotropic medication, because without medication there is a
substantial likelihood that the patient will harm him/her self or
others . . . in the reasonably foreseeable future . . . ." §
IV(C)(1)(b).  Once this "Emergency Certificate" is completed,
medication may be administered for up to 72 hours.  Id.  The
Emergency Procedure provides a mechanism for some type of review,
but does not specify who the reviewing authority must be or
whether review is even required.  § IV(C)(1)(d)-(g).

The Non-Emergency Procedure (referred to in the parties'
papers variously as "Refusing Status" and the "Three-Step Form"),
outlines a three-step procedure for overriding a patient who
refuses medication in the absence of an emergency.  First, the
treating physician must meet with the patient in an attempt to
address his concerns.  § IV(C)(2)(b)(1).  If the patient persists
in refusing medication and the physician believes that medication
is a necessary part of the patient's treatment, then the matter

---

[5] Rennie addressed mainly the Non-Emergency Procedure.  653
F.3d at 848 ("We emphasize that the emergency treatment
provisions are not at issue in this case.").

8

is referred to a treatment team.  § IV(C)(2)(b)(2).  Second, the
treatment team must review the physician's recommendation and the
patient's objections, and then document its conclusions.  §
IV(C)(2)(c)(2).  If the patient is present, the team must attempt
to formulate a treatment plan acceptable to the patient and the
team.  § IV(C)(2)(c)(1).  Third, if the patient still persists in
refusing medication, then the Medical Director must conduct a
personal examination of the patient.  § IV(C)(2)(d)(1).  If the
Medical Director agrees with the treating physician, then the
medication may be administered forcibly.  § IV(C)(2)(d)(1)(B).
Throughout this process, the patient may consult with an
independent hospital staff member known as a "Rennie Advocate."
§ IV(C)(2)(b)(2)(B).

    **C.   The Parties' Arguments**

    Plaintiff alleges that the Ancora Defendants administered
medication pursuant to the Emergency Procedure in the absence of
a genuine emergency.  Plaintiff relies upon deposition testimony
suggesting that it was the Defendants' routine practice to employ
the Emergency Procedure whenever a patient refused medication,
and as a means of inducing patient consent during the later-
pursued Non-Emergency Procedure.[6]  Plaintiff also alleges that

---

    [6] Plaintiff argues that issuing an Emergency Certificate
before initiating the Non-Emergency Procedure is coercive,
because the patient must choose between consenting to orally
administered medication, or else being subjected to forced, often
painful intravenous drug administration under the 72-hour

the Emergency Procedure lacks any meaningful procedural
safeguards of the patient's liberty interest, beyond the treating
physician's brute declaration of an emergency.  Thus, even if
Plaintiff had presented a genuine emergency, he argues, the lack
of procedural safeguards itself violated his constitutional
rights.  Finally, Plaintiff alleges that, during the Non-
Emergency Procedure, his treating physician ordered the
administration of medication in violation of professional
standards and treatment team members failed to provide
independent and impartial oversight.

     Defendants counter that a genuine emergency occurred in this
case.  They dispute that the Emergency Procedure is routinely
used in the absence of emergencies to induce patient consent.
Defendants also maintain that the Emergency Procedure provides
adequate procedural safeguards and, furthermore, that Plaintiff's
rights were preserved in the Non-Emergency authorization of drug
administration.  In any event, Defendants argue that the
doctrines of qualified and sovereign immunity, as well as the
Rooker-Feldman Doctrine (discussed below), bar Plaintiff's claims
against them.

     Plaintiff has moved for partial summary judgment on the
grounds that Defendants' undisputed conduct violated his
procedural due process rights as a matter of law.  Defendants

─────────────────────

Emergency Certificate.

have cross-moved for summary judgment on the grounds that
Plaintiff's claims lack a basis in fact and, further, that all
Defendants are immune from suit.

## II. Legal Standard

Summary judgment shall be granted if there is no genuine
issue as to any material fact and the moving party is entitled to
a judgment as a matter of law. Fed. R. Civ. P. 56(c); Hersh v.
Allen Products Co., 789 F.2d 230, 232 (3d Cir. 1986). A dispute
is "genuine" if "the evidence is such that a reasonable jury
could return a verdict for the non-moving party." See Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "At the
summary judgment stage the judge's function is not . . . to weigh
the evidence and determine the truth of the matter but to
determine whether there is a genuine issue for trial." Id. at
249. "In making this determination, a court must make all
reasonable inferences in favor of the non-movant." Oscar Mayer
Corp. v. Mincing Trading Corp., 744 F. Supp. 79, 81 (D.N.J. 1990)
(citing Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d
Cir. 1983)). However, "the party opposing summary judgment 'may
not rest upon the mere allegations or denials of the . . .
pleading'; its response, 'by affidavits or as otherwise provided
in this rule, must set forth specific facts showing that there is
a genuine issue for trial.'" Saldana v. Kmart Corp., 260 F.3d
228, 232 (3d Cir. 2001) (quoting Fed. R. Civ. P. 56(e).

11

## III. Discussion

### A. Legal Background: __Rennie v. Klein__

In 1982, <u>Youngberg v. Romeo</u> established the general proposition that patients committed to state custody have a constitutionally protected liberty interest in being free from unreasonable bodily restraints.  457 U.S. 307, 315-16 (1982). This constitutional protection is not absolute, however.  It may be curtailed when medical authorities, in the exercise of professional judgment, determine that the liberty interest is outweighed by the state's interest in maintaining safety.  <u>Id.</u> at 321-22.  Thus, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  <u>Id.</u> at 323.

The following year, the Third Circuit applied these general standards in <u>Rennie v. Klein</u>, holding that involuntarily committed patients have a constitutional right to refuse administration of antipsychotic drugs.  720 F.2d 266, 269 (3d Cir. 1983).[7]  The state may override this right when the patient

_____

[7] In fact, <u>Rennie v. Klein</u> actually produced two precedential opinions by the Third Circuit: 653 F.2d 836 (3d Cir. 1981) and 720 F.2d 266 (3d Cir. 1983).  The first opinion preceded <u>Youngberg</u> and the Supreme Court remanded it with instructions to modify the holding in conformity with <u>Youngberg</u>. On remand, the Third Circuit altered its first opinion only slightly.  <u>Rennie</u>, 720 F.2d at 269.  Thus, this Court reads the

is a danger to himself or others, but, <u>Rennie</u> held, in
non-emergency situations the state must first provide procedural
due process.  <u>Id.</u>  Because <u>Rennie</u> addressed primarily what
process is due in these <u>non-emergency</u> situations, it provides
only limited guidance as to the constitutional requirements for
forcibly administering medication in <u>emergency</u> situations.
However, <u>Rennie</u> at least stands for the following limited
propositions.

     If a patient constitutes a danger to himself or to others,
medical authorities may, in the exercise of professional
judgment, administer drugs against the patient's will.  <u>Id.</u>[8]  The
exercise of professional judgment does not necessarily require
administration of the "least restrictive" treatment, but neither
does it free medical authorities to administer whatever treatment

---

two opinions together, referring them collectively as "<u>Rennie</u>."

     [8] The parties' papers evince confusion as to what the
"professional judgment" standard requires.  Citing <u>Rennie</u>, the
Fourth Circuit instructed, "The decision may be based upon
accepted medical practices in diagnosis, treatment and prognosis,
with the aid of such technical tools and consultative techniques
as are appropriate in the profession.  Without attempting a
definitive checklist, it is obvious that a decision of the type
here in issue should involve consideration of such factors as the
patient's general history and present condition, the specific
need for the medication, its possible side-effects, any previous
reaction to the same or comparable medication, the prognosis, the
duration of any previous medication, etc.  Just as obviously, the
basis for the decision should be supported by adequate
documentation . . . ."  <u>United States v. Charters</u>, 863 F.2d 302,
312-13 (4th Cir. 1988) (internal citations omitted).

they prefer.  See id. at 270 n.8 (disclaiming carte blanche

deference to medical authorities' judgment).  Medical authorities

may administer treatment only as "necessary to prevent the

patient from endangering himself or others,"[9] and the exercise of

professional judgment may require them to consider available

alternatives in the context of such factors as the harmful side-

effects that a patient may experience.  Id. at 269-70.[10]

   Although Rennie upheld the Non-Emergency Procedure in

Administrative Bulletin 78-3, it did not approve Administrative

-------

   [9] The "only as necessary" standard is substantially more
flexible than a "least restrictive means" standard.  For example,
a doctor may determine, in her professional judgment, that,
although a less powerful drug may be available and effective, a
more powerful alternative drug is appropriate for the
circumstances.  Although not the "least restrictive means,"
administering such a drug may well comport with the "only as
necessary" standard.

   [10] Throughout their papers, Defendants construe Rennie as
permitting any forcible drug administration, as long as the
treating physician has exercised professional judgment.  This
interpretation of Rennie is untenable, particularly in the
aftermath of Harper, Riggins, and Sell (discussed infra).

   Plaintiff cites Washington v. Harper for the proposition
that to involuntarily medicate a patient, it must be in the
patient's "medical interest."  494 U.S. at 227; see also Sell v.
United States, 539 U.S. 166, 182 (2003).  To the extent accepted
professional standards require that a patient be medicated only
according to his "medical interest," Plaintiff is undoubtedly
correct.  See Harper, 494 U.S. at 222 ("[T]he fact that the
medication must first be prescribed by a psychiatrist, and then
approved by a reviewing psychiatrist, ensures that the treatment
in question will be ordered only if it is in the prisoner's
medical interests . . . .").  However, the Court is not persuaded
that, in this respect, Harper adds to the substantive standard
announced in Rennie.

14

Bulletin 78-3 in its entirety.  <u>Id.</u> at 270 n.9 ("Inasmuch as no specific provision of the regulation has been challenged, that subject, if raised, should be left to the district court for its determination in the first instance." (citation omitted)).  The matter at issue in this case -- that is, the constitutional requirements to forcibly medicate involuntarily committed patients in an <u>emergency</u> -- was not squarely resolved in <u>Rennie</u>. 653 F.3d at 848.

   <u>Rennie</u> is not the most recent authority to discuss the forcible administration of medication to people in state custody. After <u>Rennie</u>, the Supreme Court heard a line of cases about the involuntary administration of medication in the criminal context. Although these cases did not address civilly committed patients, they have obvious relevance here.  See <u>Youngberg</u>, 457 U.S. at 321-22 ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."); <u>White v. Napoleon,</u> 897 F.2d 103, 112 (3d Cir. 1990) ("Prisoners may well suffer a greater loss of liberty than persons involuntarily committed to mental institutions . . . ."). Taken together, this line of cases -- <u>Washington v. Harper</u>, 494 U.S. 210 (1990), <u>Riggins v. Nevada</u>, 494 U.S. 210 (1992), and <u>Sell v. United States</u>, 539 U.S. 166 (2003) -- establish the following inquiry, in the criminal context, to determine the

constitutionality of forcible drug administrations:

> Has the Government, in light of the efficacy, the side
> effects, the possible alternatives, and the medical
> appropriateness of a particular course of antipsychotic
> drug treatment, shown a need for that treatment
> sufficiently important to overcome the individual's
> protected interest in refusing it?

Sell, 539 U.S. at 183.  In particular, Harper held that "the Due
Process Clause permits the State to treat a prison inmate who has
a serious mental illness with antipsychotic drugs against his
will, if the inmate is dangerous to himself or others and the
treatment is in the inmate's medical interest."  494 U.S. 210,
227 (1990) (emphasis added).  Explaining Harper's holding in a
later case, the Court stated that, when deciding to forcibly
administer medication, the relevant inquiry is "whether
involuntary administration of drugs is necessary significantly to
further a particular governmental interest, namely, . . . to
[mitigate] the individual's dangerousness . . . ."  Sell, 539
U.S. at 181-82.  The two subsequent cases, Riggins and Sell,
which dealt with involuntary drug administration for purposes of
readying a criminal defendant to stand trial, similarly weighed
the necessity of the state interest against the significance of
the constitutional interest.  539 U.S. at 179; 504 U.S. at 135.

**B. Ancora Defendants: Qualified Immunity**

At the heart of this lawsuit are Plaintiff's individual
capacity claims against the Ancora Defendants, alleging
violations of his substantive and procedural due process rights.

16

The Court turns first to these claims.  Asserting qualified immunity, the Ancora Defendants argue that Plaintiff may not prosecute these claims, because they do not allege clearly established constitutional violations.[11]

The Supreme Court has set out a two-step analysis to determine whether Defendants are entitled to qualified immunity. First, taking the well founded allegations asserted in Plaintiff's complaint as true, the Court must decide whether a constitutional right has been violated. Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the Court finds that Plaintiff's claims do establish a rights violation, the Court must then decide whether it is a clearly established right that a reasonable officer would know.  Id.; see also Anderson v. Creighton, 483 U.S. 635, 641 (1987).  If it is not clearly established, then Plaintiff's claims may not proceed.  Saucier, 533 U.S. at 201.

Here, Plaintiff alleges that both his substantive and procedural due process rights were violated.  "[T]he substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the [patient] against his will; the procedural issue is whether the State's nonjudicial

_____

[11] Qualified immunity is available only for individual capacity claims for damages.  Kentucky v. Graham, 473 U.S. 159, 167 (1985).  Thus, Plaintiff's official capacity claims against the State Defendants for injunctive relief will necessarily survive a summary judgment motion brought on grounds of qualified immunity.

mechanisms . . . are sufficient." <u>Washington v. Harper</u>, 494 U.S.
210, 220 (1990).  The Court will, in turn, conduct the two-step
qualified immunity analysis for each type of due process right
asserted.

### 1. Substantive Due Process

Turning to the substantive due process claim, Plaintiff
contends that Defendants violated his right to refuse
antipsychotic medication by administering the drugs against his
will, in the absence of an emergency, and contrary to accepted
professional standards.

### i. Violation of a Constitutional Right

As explained above, <u>Rennie</u> permits medical authorities to
forcibly medicate involuntarily committed patients in an
emergency, if consistent with accepted professional standards,
necessary to prevent the patient from endangering himself or
others, and undertaken after consideration of available
alternatives.  720 F.2d at 269-70.  Here, Plaintiff alleges that
when he was first medicated against his will, (1) he did not
present a danger to himself or to others, (2) the decision to
medicate was not an exercise of professional judgment, and (3)
the decision to medicate was really an effort to induce
Plaintiff's consent to continued drug administration.[12]

---

[12] Plaintiff contends that the mere fact that he was not
medicated until almost nine hours after Monte declared him to be
an emergency (well after the asserted "emergency" had subsided)

18

Taking all of these allegations as true, which the Court
must do, <u>Saucier</u>, 533 U.S. at 201, Plaintiff has alleged a
violation of his substantive due process rights.  Before medical
authorities may medicate a patient against his will, they must
make a "predicate determination . . . that the patient was a
danger either to himself or others . . . ."  <u>Rennie</u>, 720 F.2d at
270 n.8; <u>accord</u> <u>Harper</u>, 494 U.S. at 227 (holding dangerousness to
be a precondition to forced medication).  Certainly, if a patient
does not legitimately present a danger and the Emergency
Procedure is used merely as a pretext to induce the patient's
consent, then his right to refuse antipsychotic drugs has been
violated.

Even if a patient does pose a danger, authorities can
forcibly administer medication only in the exercise of
professional judgment.  If medicating a patient would
substantially depart from accepted professional standards (for
example, if isolating the patient momentarily while he calms

---

itself amounts to a well established constitutional violation.
(Pl. Opp'n Br. 18-19.)  Since there will almost always be <u>some</u>
gap of time between the presentation of an emergency and the
administration of drugs, the Court is not persuaded that the
nine-hour lag here amounts to a well established violation.
However, the nine-hour gap, in addition to hospital records
suggesting that Plaintiff did not present an emergency at the
time he was first medicated, may provide circumstantial evidence
in support of Plaintiff's theory that the declaration of an
emergency was pretextual, as well as Plaintiff's claim that the
administration of drugs was a departure from accepted
professional standards.

down, rather than medicating him, would avert the danger more effectively),[13] then his due process right to refuse medication has been violated.

Quoting deposition testimony at length, the Ancora Defendants ask the Court to decide as a matter of fact that they soundly exercised professional judgment, because Plaintiff presented a legitimate danger.  (Def. Mot. Br. 35-44.) Plaintiff, however, has set forth "specific facts" to dispute the Ancora Defendants' claim.  See Pennsylvania Prison Society v. Cortes, 508 F.3d 156, 161 (3d Cir. 2007) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)) (discussing fact disputes on summary judgment).  For example, a number of Ancora employees testified in depositions that the first step in attempting to medicate a patient who refuses to grant consent is to issue an Emergency Certificate as a prerequisite to the Non-Emergency Procedure.  (Pl. Opp'n Br. 6.)  In particular, Monte testified that she adheres to this procedure because it facilitates the ultimate attainment of patient consent.  (Pl. Opp'n Br. 6-7.)  Dr. Evan Feibusch, the Defendants' own expert witness, conceded in his deposition testimony that this procedure was "coercive."  (Pl. Opp'n Br. 6-7.)  And Dr. Daniel Greenfield, Plaintiff's expert witness, testified that the decision to

---

[13] The Court offers this only by way of example, and does not intend to draw any conclusions here about the particular standards of the medical profession.

medicate Plaintiff was a substantial departure from accepted professional standards.  (Pl. Opp'n Br. 17-18.)  Considered together, an inference that a jury might reasonably draw from this testimony is, as Plaintiff has argued, that the Emergency Procedure was used to induce consent, and not because the patient presented a danger.  The Court hastens to note, however, that the opposite inference is also possible.  Therefore, this genuine issue of material fact is disputed.

### ii. Clearly Established Violation

Having found that Plaintiff has alleged a constitutional violation, the Court now turns to the second step of the qualified immunity analysis, namely, whether the right violated was clearly established, or, in other words, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 201-02.  This step operates "to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."  Hope v. Pelzer, 536 U.S. 730, 740 (2002).

To determine whether a reasonable official would know that his conduct was unlawful, the Court must decide whether the official could have made a reasonable mistake of law, and if not, whether he could have made a reasonable mistake of fact.  See Pearson v. Callahan, No. 07-751, 2009 WL 128768, slip op. at *6 (U.S. Jan. 21, 2009) ("The protection of qualified immunity

21

applies regardless of whether the government official's error is
a mistake of law, [or] a mistake of fact . . . ." (internal
citation omitted)); <u>Curley v. Klem</u>, 499 F.3d 199, 214 (3d Cir.
2007).  Here, Plaintiff alleges that he was forcibly medicated
pursuant to an emergency declaration in the absence of an
emergency to induce his consent.  The Court must therefore
decide, given the circumstances confronting the Ancora
Defendants, (1) whether they could reasonably have believed that
issuing the Emergency Certificate as a pretext was lawful, and if
not, (2) whether they could reasonably have believed that
Plaintiff presented a genuine emergency.

### a. Reasonable Mistake of Law

As to the first inquiry, the Court holds that no reasonable
person in the Ancora Defendants' position could have believed
that issuing the Emergency Certificate pretextually, in the
absence of a genuine emergency, was lawful.  The Court assumes
that medical authorities working with involuntarily committed
patients in state psychiatric facilities are trained to
understand their legal obligations.[14]  Furthermore, the Court
notes that the legal obligations at issue here are not obscure,
hard to comprehend, or otherwise esoteric.  Medical professionals
in state psychiatric facilities are presumably confronted on a

---

[14] Indeed, in her deposition testimony, Monte competently
discussed relevant legal precedents.  (Pl. Opp'n Br. 6.)

22

regular basis with patients who refuse medication.

Importantly here, Plaintiff does not allege a mere rights violation; he alleges that the medical authorities acted in bad faith. Although § IV(C)(1) of Administrative Bulletin 78-3, by its own terms, may be applied only in emergency situations, Plaintiff alleges that it was the regular practice for the medical authorities at this institution to declare an emergency where none existed; essentially, Plaintiff alleges that it was the standard practice for these medical authorities to fabricate emergencies so as to do an end-run around the law's consent requirement.  Although a purposeful violation of a state administrative procedure does not dispositively negate qualified immunity, Davis v. Scherer, 468 U.S. 183, 195-96 (1984), here, the procedures set out in Administrative Bulletin 78-3 (in addition to Defendants' training) would have put a reasonable person in the Ancora Defendants' position on notice as to what the Constitution requires to override a patient's will.  See id. at 204 n.2 (Brennan, J., concurring in part) ("[T]he presence of a clear-cut regulation obviously intended to safeguard . . . constitutional rights certainly suggests that appellants had reason to believe they were depriving appellee of due process."). Thus, because Administrative Bulletin 78-3 clearly set out the constitutional requirements, the Court holds that no reasonable medical authority could have believed the conduct alleged here to

be consistent with Federal law.[15]

### b. Reasonable Mistake of Fact

The second inquiry -- whether the Ancora Defendants made a reasonable mistake of fact -- presents a more difficult question. Regardless of whether Plaintiff actually presented an emergency, the Court must decide whether an objective person in the Ancora Defendants' position reasonably could have believed, given the circumstances before them, that Plaintiff presented an emergency. In <u>Anderson</u>, the Supreme Court held that police officers facing liability for an unlawful search were entitled to qualified immunity because they may mistakenly, but reasonably, have concluded that the circumstances were exigent, thus justifying the search.  483 U.S. at 641.  The Court must conduct an analogous inquiry here.  Although fact-specific, the Third Circuit has held that this is a legal determination to be made by the Court, based on an analysis of the "totality of the circumstances."  <u>Curley</u>, 499 F.3d at 207, 210-11.

The parties agree on the general outline of the February 9 events.  Shortly after being moved to Holly Hall C, Plaintiff met

---

[15] None of the Ancora Defendants assert an individualized theory of qualified immunity, for example, that one or more of them relied on the expertise or legal opinion of a superior. Plaintiff alleges that they all participated in the pretextual emergency declaration (2d Am. Compl. 9, ¶ 53), and the Ancora Defendants do not dispute their joint participation.  The Court therefore need not discuss the applicability of qualified immunity as to each individual Ancora Defendant.

24

with the treatment team, comprised of the Ancora Defendants, for a routine interview.  During the meeting, Plaintiff became upset because the treatment team members intended to prescribe medications that he believed (based on the advice of another doctor) were unwarranted.  He expressed his agitation by raising his voice and by leaving the room during the meeting.  After leaving the room, he returned voluntarily for the meeting's conclusion.

Whether the Ancora Defendants reasonably perceived a genuine emergency turns on the circumstances they confronted, in particular, what they knew at the time and just how aggravated, erratic, or violent Plaintiff was in his encounter with them.  In other words, the legal determination of whether the Ancora Defendants' perception of an emergency was reasonable, is contingent upon a factual determination of what circumstances they actually confronted.  At one end of the spectrum, if Plaintiff had been wielding a knife while shouting uncontrollably at the Ancora Defendants, their perception of an emergency would clearly have been reasonable.  At the other end of the spectrum, if Plaintiff had been sitting calmly and speaking in a conversational tone while politely expressing his disagreement with the Ancora Defendants' decision to medicate him, no reasonable person in their position would have perceived an emergency.  Predictably, however, the actual encounter falls in

the gray area between these hypothetical poles.

When conducting a "totality of the circumstances" analysis, the Court does not necessarily give equal weight to all evidence. In determining what circumstances confronted the Ancora Defendants, the Court is mindful that treatment team members' notes from the day of the incident provide more reliable evidence of their actual perceptions than does deposition testimony, in which parties often try, retrospectively, to justify their conduct long after the incident.  Furthermore, the Ancora Defendants' conclusory characterizations of Plaintiff's behavior are particularly unhelpful as they offer only their conclusions -- which is the very subject of the dispute -- rather than providing insight into the events that transpired.  In other words, the Court will not find that Plaintiff exhibited "aggressive" behavior merely because the Ancora Defendants have said so.

Ancora Defendant Monte described Plaintiff's behavior on the Emergency Certificate as:

> HOSTILE, AGGRESSIVE, ANGRY, REFUSING TO TAKE MEDS, IMPULSIVE, LONG HX [HISTORY] OF AGGRESSIVE/ASSAULTIVE/CRIMINAL BEHAVIOR, EXTREMELY MANIPULATIVE – HAS COURT ORDER TO COMPLY WITH PRESCRIBED MEDICATION – VERY CONFRONTATIONAL WITH HIGH LEVEL OF AGITATION AND HOSTILITY – HX [HISTORY] OF 2 ESCAPES FROM GPPH [GREYSTONE PARK PSYCHIATRIC HOSPITAL] – KROL STATUS.

(Pl. Stat. Mat. Fcts. 8, ¶ 37.)  In her notes, Ancora Defendant Simmerman, the team's social worker, described Plaintiff's

26

behavior as "antagonistic and smug," "sarcastic," "glib," and "hostile." (Def. Mot. Br. 15-16.) Simmerman's notes also say that Plaintiff described a previous escape and a suicide attempt in the meeting. Id. In deposition testimony, Ancora Defendant O'Connell, a psychologist, echoed Simmerman's characterizations of Plaintiff's demeanor during the meeting: "condescension, sarcasm, . . . questions back to us as opposed to answering the question . . . ." Plaintiff concedes that he was being uncooperative by "flaunting [his] legal knowledge," but disputes that this constituted threatening behavior. (Brandt Decl. 3, ¶ 4 [Docket No. 62]).

The notes of Ancora Defendant Coffee, the program coordinator, refer to a particular incident in which "the patient [Plaintiff] stood very closely to [Monte's] face and said he-- and had to be redirected to leave the area." (Coffee Dep. T88: 7-13 [Docket No. 58, Ex. L].) Coffee testified in his deposition that he could not recall the details of the incident, and did not know if the physical proximity described in his notes was attributable to movement by Plaintiff or by Monte. Id. at T90: 2-10.

O'Connell testified in her deposition that Plaintiff stood "very close to Dr. Monte" -- "nose-to-nose" -- and said something "louder than average conversation, but he wasn't yelling." (O'Connell Dep. T90:12-18 [Docket No. 58, Ex. I].) O'Connell

27

Case 1:06-cv-00923-RMB-JS   Document 65   Filed 01/29/09   Page 28 of 59 PageID: 1284

could not recall what Plaintiff said during this incident, but testified that she remembered thinking "that [Plaintiff] was going to attack [Monte] because he was so close." Id. at T89:20-T91:10.  In the deposition, counsel for Plaintiff sought a more specific description of Plaintiff's behavior during this incident:

> Q. How was [Plaintiff's] demeanor?  Did he just get up
> and walk out of the room?  Did he curse?  Did he yell?
> Did he flail his arms?  I wasn't there.  Can you
> explain to me [Plaintiff's] disposition?
> A. I recall that he was growing agitated.  He seemed
> frustrated and angry with the fact that we were
> questioning him.  He was displeased that he was still
> in the hospital.

Id. at T82:2-12.  Notably, when specifically asked, O'Connell did not say that Plaintiff cursed, yelled, or flailed his arms.

Monte also described in her deposition the incident of Plaintiff getting "[u]p to [her] face," but estimated that Plaintiff actually stood "[a]bout a foot away" from her during this incident.  (Monte Dep. T109:14-22 [Docket No. 58, Ex. L].) She characterized the incident as "intimidating" and "threatening," but, apparently referring to prior violent incidents with other patients, Monte attributed her fear, at least in part, to having been "hurt too many times."  Id. at T111:21-24.[16]  (The parties did not include in their filings the

---

[16] Monte also testified that Plaintiff was "flailing his hands" (Monte Dep. T112:14 [Docket No. 58, Ex. L]), but this testimony is not corroborated by the other Ancora Defendants. The Court is therefore unsure of what credit to give it.

portion of Ancora Defendant Simmerman's deposition testimony discussing this incident.)

Plaintiff disputes that he displayed aggressiveness or hostility, although he does not dispute that he was upset about the treatment team's insistence on prescribing antipsychotic medication, nor that he left the room at one point in the meeting.  Plaintiff also contends that he "did not get in Dr. Monte's face and . . . did not threaten her or anyone else." (Brandt Decl. 4, ¶ 5 [Docket No. 62].)  As he explains the encounter, "While being escorted out of the room, [he] turned around and started yelling at [Monte]."  (Pl. Stat. Mat. Fcts. 7, ¶ 32.)

Plaintiff offers some circumstantial evidence casting doubt upon the Ancora Defendants' account.  First, deposition testimony from a number of hospital employees demonstrates that it was routine practice to issue the Emergency Certificate whenever patients refused medication as a prerequisite to the Non-Emergency Procedure.  (Pl. Stat. Mat. Fcts. 9-15, ¶¶ 43-50.) Although this fact does not alone prove that Plaintiff in this case did not present an emergency, it does, first, suggest that the Ancora Defendants may have been in the habit of misusing the Emergency Procedure, and, second, belie a claim by the Ancora Defendants that the perception of an emergency was a good-faith mistake.

29

Second, Plaintiff was not medicated pursuant to the
Emergency Certificate until nearly nine-hours after the treatment
team meeting, during which time he displayed no aggressive or
otherwise abnormal behavior according to the one-to-one
precautions log.  The fact that Plaintiff was not medicated
immediately suggests that the Ancora Defendants did not
subjectively believe that he posed an immediate danger to himself
or others.  Although the present inquiry is objective, the Ancora
Defendants' slow reaction suggests that Plaintiff's behavior was
not sufficiently violent or erratic to warrant an urgent
response.  In other words, the nine-hour delay suggests that
Plaintiff's behavior was not quite as threatening as the Ancora
Defendants now contend.

Third, the depositions of Monte, Coffee, and O'Connell say
that Plaintiff was "redirected" without difficulty.  (O'Connell
Dep. T92:6-14 [Docket No, 58, Ex. I].)  (Coffee Dep. T90:17-T91:8
[Docket No. 58, Ex. J].)  (Monte Dep. T110:1-T111:19 [Docket No.
58, Ex. L].)  Apparently, when Plaintiff moved close to Monte, a
hospital staff-member intervened and, without force, asked
Plaintiff to desist.  Plaintiff willingly complied.  His response
suggests that his behavior, even if agitated, was controlled and
rational, not violent and erratic.

Finally, the depositions are inconsistent as to why,
exactly, the Emergency Certificate was issued.  Monte testified

that, in addition to Plaintiff's general aggression, he was
medicated because he posed a danger to himself.  (Monte Dep.
T125:13-25 [Docket No. 58, Ex. L].)  Coffee, however, testified
that Plaintiff did not pose a danger to himself, and that the
Emergency Certificate was issued only to prevent him from
escaping and from being violent toward others in the ward.
(Coffee Dep. T92:15-23, T98:13-T99:9 [Docket No. 58, Ex. J].)
Despite these inconsistent accounts, when asked whether the
antipsychotic drugs were administered to "suppress [Plaintiff's]
hostility" -- in other words, to avert the danger he allegedly
presented -- or as routine "treatment" for his underlying
psychological illness, Monte answered, "It's a treatment."
(Monte Dep. T115:15-24 [Docket No. 58, Ex. L].)  This admission
may support Plaintiff's contention that he was not medicated to
avert an emergency at all.

Confronted with conflicting evidence, the Court is at a loss
in determining what actually occurred in the treatment team
meeting.  All of the Ancora Defendants were displeased with
Plaintiff's attitude during the meeting.  He apparently began the
meeting with an uncooperative and adversarial tone.  As the
meeting progressed, he apparently grew increasingly frustrated
because the treatment team insisted on prescribing medications
that another physician had told him were unwarranted.  The Court
is persuaded that he expressed his frustration by raising his

31

voice, storming out of the room, and, at one point, drawing

closer to Monte.  However, the Court does not know how to weigh

the Ancora Defendants' conclusory characterizations of

Plaintiff's behavior as "hostile," "aggressive," "angry,"

"impulsive," "antagonistic," "intimidating," and "threatening."

Plaintiff disputes the accuracy of these characterizations and,

as the Court has stated, it will not take them as true merely

because the Ancora Defendants have said so.  Furthermore,

evidence presented by Plaintiff -- namely, the Ancora Defendants'

habit of employing the Emergency Procedure in the absence of an

emergency, the nine-hour delay before medication was

administered, Plaintiff's tranquil behavior during that nine-hour

period, the hospital staff's easy "redirection" of Plaintiff

during the meeting, and inconsistent testimony as to why the

medication was administered -- suggests that the Ancora

Defendants' characterizations may have been overstated.

The Court cannot hold, based on the evidence before it, that

a reasonable person in the Ancora Defendants' position would have

perceived an emergency.  This inquiry turns on what behavior

Plaintiff actually displayed in the treatment team meeting.  From

the evidence on the record, it is just as likely that Plaintiff

displayed aggressive and violent behavior giving rise to a

reasonably perceived emergency, as it is that Plaintiff expressed

his frustration with such non-threatening, commonplace behaviors

as raising one's voice, leaving the room, and moving closer to
one's disputant.  To resolve this factual dispute, the Court
would have to make a credibility determination about such factors
as whether or not Plaintiff was yelling and flailing his hands,
as Monte testified in her deposition.  The Court is unable to
make such a determination on a written record alone.  As the
decision of whether the Ancora Defendants reasonably perceived an
emergency is contingent upon the credibility-centered factual
determination of what circumstances they confronted, the Court
cannot decide the legal issue without first resolving the factual
dispute.

In these cases, the Third Circuit has instructed that
District Courts may "utilize a jury in an advisory capacity, but
responsibility for answering th[e] ultimate question remains with
the court."  <u>Curley</u>, 499 F.3d at 211 n.12, 212; <u>see also</u> <u>Apata v.</u>
<u>Howard</u>, No. 05-3204, 2008 WL 4372917, slip op. at *13 (D.N.J.
2008) (Irenas, J.) ("When key historical facts are disputed, the
Court is obliged to defer a decision on qualified immunity until
a more appropriate juncture, possibly with the assistance of an
advisory jury. . . . In practice, District Courts may use special
interrogatories to allow juries to perform this function.").
This suggests that the Court may resolve the mistake-of-fact
question in one of three ways: (1) present special
interrogatories to the jury (in an advisory capacity) at the

conclusion of trial, (2) hold a pretrial hearing before an advisory jury, which would answer special interrogatories, or (3) hold a pretrial hearing at which the parties would present more evidence to the Court, with the Court as factfinder (for the sole purpose of resolving qualified immunity).  The Court notes that the latter two options have the advantage of resolving this matter before trial, so the Ancora Defendants, if held to be qualifiedly immune, would not undergo the burdens of defending against these claims at trial.  See Curley, 298 F.3d at 278 (noting the "imperative [of] decid[ing] qualified immunity issues early in the litigation").  However, the Court is mindful that holding a "mini-trial" before a specially empaneled advisory jury would impose a new set of burdens on the litigants.  Thus, the Court will allow the parties to confer and decide jointly which of these procedures shall be used.

### 2. Procedural Due Process

The Court now turns to Plaintiff's allegation that he was deprived of procedural due process.  The procedural issue in dispute is the constitutional sufficiency of the nonjudicial mechanisms used to make and review the decision to medicate patients against their will.  Harper, 494 U.S. at 220.  Plaintiff alleges two procedural deprivations: first, that the Emergency Procedure lacks four procedural safeguards; and second, that the treatment team charged under the Non-Emergency Procedure with

34

reviewing the decision to involuntarily medicate failed to be impartial and independent.  As to these claims, the Ancora Defendants assert qualified immunity.[17]

### i. Emergency Procedure

With respect to the Emergency Procedure, Plaintiff alleges four constitutional deficiencies: (1) lack of post-deprivation hearing; (2) lack of periodic reviews during the term of drug administration;[18] (3) no requirement that the administering doctor consider lesser-intrusive measures; and (4) administration of medication when the emergency is "reasonably foreseeable," rather than "imminent."

There is no dispute that involuntarily committed patients

_____

[17] In a recent case, the Supreme Court eliminated Saucier's requirement that courts decide the constitutional question when the immunity question is dispositive, as it will prove to be here.  Pearson v. Callahan, No. 07-751, 2009 WL 128768, slip op. at *6 (U.S. Jan. 21, 2009).  The Court chooses to employ the two-step Saucier procedure in any event, because "the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." Id. at *11.

[18] The Court questions whether Plaintiff has standing to raise a claim arising out of the failure to periodically review his "emergency" status.  Defendants administered medication to Plaintiff only twice under the Emergency Procedure.  Even if periodic reviews had been required, the Court questions whether Plaintiff would have benefitted from such a review before his second and final "emergency" administration of medication at 8:00 a.m. on Friday, February 10.  In any event, as explained more fully below, the Court will, assuming standing, grant summary judgment to Defendants on this claim on grounds of qualified immunity.

have a constitutional interest in being free from unwanted antipsychotic medication, nor is there a dispute that medical authorities may, constitutionally, override a patient who refuses medication in an emergency.  The critical dispute here is what procedural safeguards state hospitals owe involuntarily committed patients when they are forcibly medicated in an emergency.  In answering the question of what process is due when the government deprives persons of constitutionally protected liberties, Courts apply the three-part inquiry set out in Mathews v. Eldridge:

> [R]esolution of the issue whether the administrative procedures . . . are constitutionally sufficient requires . . . consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 334 (1976).

### a. Post-Deprivation Process

Plaintiff claims that when a patient is medicated against his will pursuant to an emergency declaration, he is entitled to an intra-administrative post-deprivation hearing and periodic reviews during the term of drug administration (usually, 72 hours).  As to the first Mathews factor: the private interest at stake is that patients may be subjected arbitrarily to unwanted bodily intrusion, see Rochin v. California, 342 U.S. 165, 172-74

36

(1952), and, by exercising control over their mental faculties,
to a stripping of their very autonomy, see Lawrence v. Texas, 539
U.S. 558, 562 (2003) ("Liberty presumes an autonomy of self that
includes freedom of thought . . . ."). In the prison context,
the Supreme Court has characterized the interest in avoiding the
unwanted administration of antipsychotic drugs as "significant."
Washington v. Harper, 494 U.S. 210, 221 (1990); see also Sell v.
United States, 539 U.S. 166, 178 (2003).  The interest at stake
is at least as consequential here.[19]

As to the second Mathews factor: § IV(C)(1) of
Administrative Bulletin 78-3 does not establish any procedures,
other than the administering doctor's brute declaration of an
emergency, to avoid an erroneous decision to medicate.[20]  Indeed,
§ IV(C)(1) does not even define "emergency," leaving the
determination of what circumstances and behaviors justify forced

_____

[19] Civilly committed patients may have a greater interest in
avoiding the unwanted administration of antipsychotic drugs than
criminal defendants, since civilly committed patients have not
been found guilty of committing a crime.  See Youngberg, 457 U.S.
at 321-22 ("Persons who have been involuntarily committed are
entitled to more considerate treatment and conditions of
confinement than criminals whose conditions of confinement are
designed to punish."); White v. Napoleon, 897 F.2d 103, 112 (3d
Cir. 1990) ("Prisoners may well suffer a greater loss of liberty
than persons involuntarily committed to mental institutions . . .
."). Nonetheless, the Court proceeds on the narrow holding that
the interest at stake here is at least "significant."

[20] § IV(C)(1) does seem to establish some mechanism for
review of the treating doctor's determination, but it does not
specify who must conduct this review or whether the review is
even required.

37

medication to the administering doctor.[21]  Without any procedural
check on the decision of the administering doctor, there is
substantial opportunity for errors of fact and law: Doctors may
perceive an emergency where none exists, and doctors may believe
that certain circumstances constitute an emergency, which, under
the law, do not.  (In this case, for example, evidence suggests
that Monte may have believed that any patient who angrily refuses
to be medicated presents an emergency, and that a historically
violent patient may be medicated in the absence of an emergency
to avoid the risk that a future emergency might arise.  (Pl.
Opp'n Br. 13-14.))  A treating physician might also declare an
emergency in bad faith to quiet a bothersome patient.  Finally, a
patient presenting a momentary emergency who could be pacified by
a single administration of medication may be medicated for up to
72 hours pursuant to § IV(C)(1); in other words, the state may
continue to sacrifice the patient's liberty interest long after
the emergency has subsided.

　　A post-deprivation hearing and periodic reviews during the
term of drug administration would substantially remediate these

---

[21] Doctors are constrained by accepted professional
standards, but there is substantial room for disagreement within
this flexible constraint.  Further, the controlling case-law
appears to require that the patient pose a threat to himself or
others, but one wonders if this provides any more meaningful
guidance than the requirement that an "emergency" exist (i.e., is
a patient, whose annoying but otherwise-harmless misbehavior
diverts hospital-staff attention from other patients, creating a
"threat" to others that would justify forced medication?).

risks.  Allowing the patient to speak in his own defense before
an impartial intra-administrative review committee would put the
administering doctor on notice that her emergency declaration
must be supported by a proper basis in fact and law.  See <u>Fuentes
v. Shevin</u>, 407 U.S. 67, 81 (1972) ("[W]hen a person has an
opportunity to speak up in his own defense, and when the State
must listen to what he has to say, substantially unfair and
simply mistaken deprivations of [liberty] interests can be
prevented.").  Furthermore, periodic reviews would ensure that a
patient's liberty interest is curtailed only to the extent
reasonably necessary.

As to the third <u>Matthews</u> factor, the Court is mindful that
requiring a post-deprivation hearing and periodic reviews would
impose an administrative burden on state hospitals.  However, the
burden would not be substantially greater than the existing
burden accompanying the Non-Emergency Procedure, which requires
three independent levels of review.[22]  Furthermore, it seems, the
added administrative burden would be offset by a reduced fiscal
burden.  Presumably, administering twice-daily intravenous

---

[22] The Court notes the perverse incentive established by the
current system, in which the Non-Emergency Procedure is more
burdensome than the Emergency Procedure.  While there should be
no obstacle to the immediate administration of medication in a
bona fide emergency, the Emergency Procedure <u>should be</u> somewhat
more onerous on hospital officials, as it is the most blunt
instrument legally available to curtail the patient's liberty
interest in refusing medication.

medication for 72-hours to a patient who requires medication for
a lesser period is a needless expense.  Moreover, the post-
deprivation hearing and periodic reviews may, to some extent,
alleviate the need for other expensive emergency-management
measures, like the one-to-one precautions that were in place for
Plaintiff.  Accord Holman v. Hilton, 712 F.2d 854, 860 (3d Cir.
1983) ("[The denial of process] increase[s] prison discord by
blocking a significant means of orderly dispute resolution.").

   Nonetheless, even were the administrative burden more
onerous, it is justified here.  "[W]here exigent circumstances
[justify the suspension of constitutional interests without
delay], it is still necessary to make available 'some meaningful
means by which to assess the propriety of the State's action at
some time after the initial [deprivation]' in order to 'satisfy
the requirements of procedural due process.'"  Elsmere Park Club,
L.P. v. Town of Elsmere, 542 F.3d 412, 420 (3d Cir. 2008)
(quoting Parratt, 451 U.S. at 539).  Where the interests at stake
are as important as they are here, and the available procedural
safeguards may so effectively cure the constitutional deficiency,
even a substantial administrative burden is outweighed in the
Mathews balancing analysis.  See Hamdi v. Rumsfeld, 542 U.S. 507,
531-33 (2004) (holding that procedural safeguards were necessary
in spite of the countervailing "weighty and sensitive
governmental interests"); In re Application for Order Authorizing

Installation of a Pen Register, 610 F.2d 1148, 1157 (3d Cir.
1979) (holding that individual interests outweighed the
"substantial governmental interest" in avoiding a hearing); see
also Addington v. Texas, 441 U.S. 418, 425-27 (1979).  For these
reasons, the Court holds that where post-deprivation process
provides an opportunity to vindicate significant constitutional
interests, that process strikes the proper balance under the
tripartite Mathews test.  See, e.g., Zinermon v. Burch, 494 U.S.
113, 127-130 (1990); see also Board of Regents of State Colleges
v. Roth, 408 U.S. 564, 570 n.7 (holding that post-deprivation
hearings are permissible only in "extraordinary situations where
some valid government interest is at stake" (citation omitted));
Tillman v. Lebanon County Correctional Facility, 221 F.3d 410,
421 (3d Cir. 2000).  Accordingly, because Plaintiff alleges that
he was denied a post-deprivation hearing and periodic reviews
under the Emergency Procedure, his claims assert a violation of
his constitutional rights.[23]

### b. Standards for Administering Medication

Plaintiff next contends that the legal standard for

---

[23] Defendant maintains that Plaintiff did, in fact, receive
post-deprivation process, insofar as the Non-Emergency Procedure,
which was adopted the day after Monte issued the Emergency
Certificate, amounts to post-deprivation review of the prescribed
medications.  Since the asserted constitutional deprivation (that
is, whether medical authorities properly utilized the Emergency
Certificate) is not under review in the Non-Emergency Procedure,
however, it fails to provide post-deprivation process.

41

administering medication on an emergency basis, established by §
IV(C)(1), denies patients their procedural due process.
Plaintiff argues that patients are entitled to, first,
consideration of lesser-intrusive measures, and second,
administration of medication only when an emergency is
"imminent," rather than merely "reasonably foreseeable."

When faced with an emergency, procedural due process clearly
requires medical authorities to consider measures that may avert
the danger without stifling patients' liberty interest in
refusing medication.  Plaintiff does not argue, and the Court
does not hold, that medical authorities must <u>employ</u> the least-
intrusive measure;[24] rather, medical authorities are obliged only
to <u>consider</u> courses of action that may avert the emergency
without restricting patients' liberty interest.  <u>United States v.
Charters</u>, 863 F.2d 302, 312-13 (4th Cir. 1988); <u>Bee v. Greaves</u>,
744 F.2d 1387, 1396 (10th Cir. 1984); <u>United States v. Bryant</u>,
670 F. Supp. 840, 844 (D. Minn. 1987).  Indeed, the Supreme Court
has held that, in emergency situations, doctors must "tak[e]
account of less intrusive alternatives" before involuntarily
medicating a criminal defendant to stand trial.  <u>Sell v. United
States</u>, 539 U.S. 166, 179, 181 (2003); <u>see also Riggins v.
Nevada</u>, 504 U.S. 127, 135 (1992) (requiring consideration of

---

[24] <u>Rennie</u> expressly disclaimed a requirement that medical
authorities employ the least-intrusive measure.  720 F.2d at 269.

lesser-intrusive alternatives for a court to order involuntary medication during trial).

The holding of Sell is consistent with dictum in Rennie, which instructs that, in an emergency, antipsychotic drugs may be constitutionally administered only when "such an action is deemed necessary to prevent the patient from endangering himself or others.  Once that determination is made, professional judgment must also be exercised in the resulting decision to administer medication."  720 F.2d at 269-70 (emphasis added).  This portion of Rennie is important in two respects.  First, by articulating a two-part standard (first, the doctor must deem involuntary medication necessary to avert an emergency, and second, she may medicate the patient only if consistent with professional judgment), the Court declined to give carte-blanche deference to doctors acting in the exercise of professional judgment.  Accord id. at 270 n.8 (disclaiming such absolute deference).  And second, for medical authorities to deem that the involuntary administration of medication is "necessary to prevent the patient from endangering himself or others," the medical authorities must have considered alternatives.  Accord id. at 269 (requiring consideration of collateral factors, such as "whether and to what extent the patient will suffer harmful side effects").  If an alternative -- say, momentarily isolating an angry patient while he calms down -- would more effectively avert the danger, then it

43

cannot be said that administering medication is "necessary." Taken together, therefore, <u>Sell</u> and <u>Rennie</u> endorse the proposition that medical authorities must consider lesser-intrusive alternatives before involuntarily administering medication.  Furthermore, because this imposes a negligible administrative burden, and may restrain an impulsive doctor from needlessly stifling a patient's significant liberty interest in refusing medication, application of <u>Sell</u> here properly applies the <u>Mathews</u> test.

Whether procedural due process limits the involuntary administration of medication only to "imminent" emergencies, rather than all "reasonably foreseeable" emergencies, is a more difficult question.  Plaintiff argues that the "reasonable foreseeability" standard of § IV(C)(1) is overbroad, as virtually any involuntarily committed patient -- who, by definition, poses a danger to society[25] -- may be considered a "reasonably foreseeable" danger.  As a practical matter, Plaintiff contends that Ancora's medical staff believed that the "reasonable foreseeability" standard of § IV(C)(1) gave license to classify as an emergency any patient who refused medication.  (Pl. Mot.

---

[25] <u>See O'Connor v. Donaldson</u>, 422 U.S. 563, 575 (1975) (holding that the state may involuntarily commit only patients who continue to be dangerous).

Br. 28.)[26]

The Court is mindful that the imminence standard urged by Plaintiff would impose a considerable burden on administering doctors, a consequence that Rennie cautioned against. 653 F.2d at 851. Doctors might refrain from medicating genuinely dangerous patients for fear that a reviewing authority might not see sufficient evidence of imminence. On the other hand, if every involuntarily committed patient poses a "reasonably foreseeable" emergency, then the existing standard fails to offer any meaningful protection of patients' liberty interest in refusing medication. Balancing these competing considerations, as the Mathews test requires, the Court holds that medical authorities may medicate involuntarily committed patients against their will only in an imminent or reasonably impending emergency. Medical authorities may not medicate involuntarily committed patients on the mere foreseeable possibility that a future emergency might arise. An emergency that is imminent or reasonably impending triggers the authority to involuntarily

---

[26] Plaintiff also points to deposition testimony suggesting that the medical authorities in this case may have believed that a historically violent patient may legally be medicated in the absence of an emergency to avoid the risk that a future emergency might arise. (Pl. Opp'n Br. 13-14.)

Defendants dispute that Ancora's staff administered medication in the absence of bona fide emergencies, and maintain that the existing regulation already implies an imminence standard insofar as an "emergency" is, by definition, urgent and immediate. (Def. Opp'n Br. 16-17.)

medicate within the bounds of due process.  To be clear, however,
medical authorities need not wait until an anticipated danger
actually materializes before administering medication.

     Accordingly, because Plaintiff alleges that the Ancora
Defendants involuntarily medicated him without considering
lesser-intrusive measures, and in the absence of a reasonably
impending emergency, his claims properly assert a violation of
his constitutional rights.

### c. Clearly Established Rights

     Having determined that Plaintiff's procedural due process
claims assert violations of his constitutional rights, the Court
now turns to the second step of the qualified immunity analysis,
namely, whether the rights violated were clearly established.
Saucier, 533 U.S. at 201; Anderson, 483 U.S. at 641.  They
clearly were not.  Plaintiff all but concedes this point by
beginning the brief in support of his motion for summary judgment
with the words, "This case now presents the Court with a . . .
question of first impression: whether the emergency treatment
provision of Administrative Bulletin 78-3 meets procedural due
process standards."  (Pl. Mot. Br. 1 (emphasis added).)  If this
is a question of first impression, then it cannot be said that
the law is well established.  Hill v. Borough of Kutztown, 455
F.3d 225, 244 n.27 (3d Cir. 2006).  When the Ancora Defendants,
according to the Second Amended Complaint, denied Plaintiff a

post-deprivation hearing, failed to periodically review his
"emergency" status, neglected to consider lesser-intrusive
measures, and medicated him to avert only a "reasonably
foreseeable" emergency, they were acting pursuant to the dictates
of Administrative Bulletin 78-3 and the controlling case, <u>Rennie</u>.
"[T]he existence of a statute or ordinance authorizing particular
conduct is a factor which militates in favor of the conclusion
that a reasonable official would find that conduct
constitutional." <u>Grossman v. City of Portland</u>, 33 F.3d 1200,
1208-09 (9th Cir. 1994).  As the constitutional violations
alleged by Plaintiff are not clearly established, the Ancora
Defendants are shielded by qualified immunity.[27]  The Court will
therefore grant partial summary judgment to Defendants on the
ground that Plaintiff may not continue to prosecute claims
against Defendants for which Defendants are qualifiedly immune.
For this reason, the Court must also deny Plaintiff's motion for
partial summary judgment.

### ii. Non-Emergency Procedure: Treatment Team Review

At or about noon on Friday, February 10, Plaintiff was put
on "refusing status" pursuant to the Non-Emergency Procedure.
After that time, Plaintiff continued to be medicated against his

---

[27] Because the Court grants qualified immunity on grounds
that the Ancora Defendants may have made a reasonable mistake of
law, it need not decide whether they may also have made a
reasonable mistake of fact.

will, but now under the Non-Emergency Procedure, rather than the Emergency Procedure that had been initiated the previous day. The second step in the three-step Non-Emergency Procedure is a meeting of the treatment team, which attempts to reach agreement with the patient on a treatment plan and reviews the treating physician's recommendation.  Plaintiff contends that, in this case, the treatment team failed to provide an independent and impartial review, which, he argues, is a requirement of procedural due process.

Defendants O'Connell, Simmerman, and Coffee (the treatment team defendants) assert two grounds for summary judgment on this claim.  First, they argue that the claim, on its merits, lacks a sufficient factual basis to survive summary judgment.  Second, they again assert qualified immunity.

As to the first asserted basis for summary judgment: the Court holds that a jury could reasonably conclude that the treatment team failed to provide an independent and impartial review.  When the treatment team approved Monte's "refusing status" recommendation, it certified that medication was a "necessary part of this patient's treatment plan."  (Three Step Form 1 [Docket No. 58, Ex. N].)  Section II(B) of Administrative Bulletin 78-3 establishes a specific standard requiring

particular findings to reach this determination.[28]  But rather
than employing this standard, the treatment team justified its
decision merely by citing Plaintiff's "manipulative,"
"hostil[e]," "assaultive," and "aggressive" behavior --
apparently parroting Monte's characterizations that were written
on the same form.  Id.  In other words, instead of making the
independent findings required by § II(B), the treatment team
appears to have recited the rationale for Monte's recommendation,
which was based upon her knowledge of Plaintiff's historically
aggressive behavior and impressions of Plaintiff from the
previous day's confrontation.  (Coffee Dep. T121:24-T123:17
[Docket No. 58, Ex. K].)  In support of his contention that the
treatment team "rubber stamped" Monte's recommendation, Plaintiff
also cites deposition testimony suggesting that particular
treatment team members may have been biased in favor of approving
involuntary drug administrations.  (Pl. Opp'n Br. 29.)  Taken

---

        [28] Section II(B) requires the following medical findings:
(1) The patient is incapable, without medication, of
participating in any treatment plan available at the hospital
that will give him/her a realistic opportunity of improving
his/her condition; or
(2) Although it is possible to devise a treatment plan that is
available at the hospital and will give the patient a realistic
opportunity to improving his/her condition, either:
        (a) a treatment plan which includes medication would
        probably improve the patient's condition within a
        significantly shorter time period; or
        (b) there is a significant possibility that the patient will
        harm him/her self or others before improvement of his/her
        condition is realized, if medication is not realized.

together, there is clearly enough supporting evidence for
Plaintiff's claim to survive summary judgment; whether or not
treatment team members failed in their constitutional obligation
to provide an independent and impartial review presents a genuine
issue of material fact for trial.[29]

Defendants next assert qualified immunity as a defense to
this claim.  The defense is unavailing here, however, since an
intra-administrative reviewer's independence and impartiality are
well established constitutional requirements.

First, Plaintiff is constitutionally entitled to an
independent review by the treatment team.  In its defense of the
Non-Emergency Procedure, Rennie explained that intra-
administrative review procedures, like that of the treatment
team, are not so influenced by institutional pressures as to
"prevent an independent decision."  653 F.2d at 850.  In fact,
Rennie lauded the treatment team review procedure, because

_____

[29] On a related claim -- that Monte did not exercise
professional judgment in approving the February 10 non-emergency
drug administration -- Defendants have asserted that there exists
no genuine issue of material fact, because Plaintiff lacks
evidence showing that the medical decision "deviated so far from
accepted professional judgment, practice, or standards that it
could not have been based on such professional judgment."  (Def.
Repl. Br. 11.)  As the Court has discussed at length, Defendant
relies upon the wrong standard here.  See supra note 10 and
accompanying text.  Plaintiff's expert testified that the
February 10 non-emergency administration of medication was "a
substantial deviation from accepted standards or [sic] care in my
opinion."  (Pl. Opp'n Br. 23.)  This testimony is sufficient to
raise a genuine issue of material fact for trial.

"mental health professionals, rather than judges who have doffed their black robes and donned white coats, . . . [are better equipped to] protect the patients' interests at stake."  Id. at 851 (emphasis added).  Of course, a committee of medical professionals can protect the interests of patients only if their review is independent and impartial.

The independence and impartiality of intra-administrative review committees in this context is emphasized as a basic requirement outside the Third Circuit as well.  The Supreme Court, in Harper, upheld a similar review procedure in the context of criminal incarceration on grounds that the reviewing body was sufficiently "independen[t]," "[un]involved in the [patient's] current treatment or diagnosis," and lacking any "institutional biases."  494 U.S. at 234.  The Court was "not willing to presume that members of the [medical] staff lack the necessary independence to provide [a patient] with a full and fair hearing in accordance with the Policy."  Id. at 234-35 (emphasis added) (citing Vitek v. Jones, 445 U.S. 480, 496 (1980); Parham v. J.R., 442 U.S. 584, 613-16 (1979)).  Other federal courts confronted with similar facts have upheld intra-administrative medical review procedures for the same reasons. See, e.g., Project Release v. Prevost, 722 F.2d 960, 981 (2d Cir. 1983); United States v. Leatherman, 580 F. Supp. 977, 980 (D.D.C. 1983).  Thus, Plaintiff's well founded allegations that the

51

treatment team failed to provide independent and impartial
oversight properly assert a constitutional deprivation.

Second, this constitutional deprivation is clearly
established such that a reasonable treatment team member would
have known that failure to provide independent and impartial
oversight is unlawful.  The Court expects that a reasonable
medical decision-maker at Ancora is familiar with the
requirements of Administrative Bulletin 78-3, the procedures of
which exist to protect patients' constitutional interests.  See
discussion supra at § III(B)(1)(ii)(a).  Furthermore, the Non-
Emergency Procedure requires separate levels of review before a
patient may be involuntarily medicated for an obvious reason: to
protect the patients' interests from unjustified breach by the
treating physician.  Rennie, 653 F.2d at 850-51.  A reasonable
treatment team member would know that this is possible only if
the treatment team maintains independence and impartiality.[30]
Because the three treatment team members shared an equal role in
approving Monte's non-emergency recommendation, the Court need
not parse the applicability of qualified immunity for each one.
Accordingly, Defendant treatment team members are not qualifiedly

_____

[30] As to this claim, the Ancora Defendants do not contend
that they are entitled to qualified immunity for making a
reasonable mistake of fact.  To mount this argument, they would
have needed to demonstrate that a reasonable person in their
position would have thought that he or she was being impartial
and independent.  The Court sees no basis for this argument based
on the record before it.

immune from litigation of this claim.

### C. State Defendants: Official Capacity

Plaintiff acknowledges that the State Defendants, named only in their official capacities, are immune from suit for damages under the doctrine of sovereign immunity. (Pl. Opp'n Br. 39-40.) His claims against them, therefore, seek only injunctive relief.[31] Id.

The claims asserted in the Second Amended Complaint arise from an incident that occurred while Plaintiff was a patient at Ancora Psychiatric Hospital. (Def. Stat. Mat. Fcts. 1, ¶ 1.) However, Plaintiff is no longer a patient at that hospital; he is now committed involuntarily at Ann Klein Forensic Center, which is another state psychiatric hospital. (Def. Stat. Mat. Fcts. 1, ¶ 1.)

To have standing, plaintiffs seeking injunctive relief must show a substantial likelihood of future harm. Los Angeles v. Lyons, 461 U.S. 95, 111 (1983); Roe v. Operation Rescue, 919 F.2d 857, 864-65 (3d Cir. 1990). It is unlikely that Plaintiff can show a substantial likelihood of future harm here, given that the claims raised in the Second Amended Complaint arise from a

---

[31] The State Defendants move for summary judgment on the basis that they are entitled to Eleventh Amendment immunity. Plaintiff correctly concedes that sovereign immunity shields the State Defendants from suit for damages, but not injunctive relief. To the extent that the Second Amended Complaint seeks damages from the State Defendants, (2d Am. Compl. 11, ¶ 68(c)), the Court will treat these claims as withdrawn.

particular incident, brought about by a unique set of
circumstances, at a hospital at which Plaintiff is no longer a
patient.[32]  Because standing is a constitutional requirement
limiting jurisdiction, which courts must raise <u>sua</u> <u>sponte</u>,
<u>Addiction Specialists, Inc. v. Township of Hampton</u>, 411 F.3d 399,
405 (3d Cir. 2005), the Court will dismiss all claims against the
State Defendants, without prejudice, for lack of standing.  Since
this matter has not been briefed, however, the Court will
reconsider the issue if Plaintiff can show, by written submission
within 30 days of the issuance of this OPINION, that he does
indeed have standing to assert claims against the State
Defendants for injunctive relief.

**D. Rooker-Feldman Doctrine**

Two days before the events giving rise to this lawsuit, on
February 7, a state commitment court ordered, <u>inter</u> <u>alia</u>, that
Plaintiff "cooperate with his treatment team and take any
medications prescribed by the treating psychiatrist . . . ."

---

[32] Plaintiff may argue that there is a substantial
likelihood of future harm because he continues to be
involuntarily committed at a state hospital (albeit a different
one) and the state's constitutionally deficient procedures are
still in effect.  Under <u>Lyons</u>, however, this alone is
insufficient to establish standing.  Plaintiff's briefing makes
clear that the particular conflict underlying this lawsuit arose
due to a peculiar set of circumstances involving his transfer
between wards at Ancora and his interaction with the Ancora
Defendants.  The Court has no reason to believe that this same
sort of conflict is likely to arise again, especially since
Plaintiff is no longer a patient at Ancora.

(Pl. Opp'n Br. 33.)  Defendants seek summary judgment on the remaining claims, because, they argue, these claims amount to an impermissible re-litigation of the issue decided by the state commitment court, that is, whether Plaintiff must take medication prescribed by his treating psychiatrist.

The Rooker-Feldman Doctrine holds that federal district courts are not empowered to review state court judgments. District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 476 (1983).  Essentially, the Doctrine forecloses § 1983 as a federal avenue to appeal state court decisions.  It is a narrow doctrine "confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284 (2005).

Here, Plaintiff does not seek review of whether he should have been ordered by the commitment court to take the prescribed medication.  A verdict in favor of Plaintiff at trial will not suggest that the state commitment court's decision was wrong or should be reversed.  See Ernst v. Child and Youth Services, 108 F.3d 486, 491-92 (3d Cir. 1997).  This is because this Court will make no judgment as to the appropriateness of Plaintiff's

decision to refuse medication.[33]   What is disputed in this case -
- not under consideration by the state commitment court -- are
the conditions for state medical authorities to override civilly
committed patients when they refuse medication.  An order from a
state commitment court that a patient must take prescribed
medications does not relieve the administering medical
authorities of their constitutional obligations.  These
obligations, and not the decision of Plaintiff to refuse
medication, are at issue in this lawsuit.  Accordingly,
Defendants' reliance on the Rooker-Feldman Doctrine as a basis
for summary judgment is without merit.

**E. Defendant Haynes**

The parties' papers evince confusion over the status in this
litigation of Defendant Anthony Haynes, who was the Rennie
Advocate at Ancora during the events underlying this lawsuit.
The Second Amended Complaint identifies Haynes only as a State
Defendant and asserts claims against him only in his official
capacity.  (2d Am. Compl. 4, ¶¶ 12, 14.)  Beyond listing him as a
State Defendant sued in his official capacity, the Second Amended

---

[33] Defendants' argument here betrays a misunderstanding of
the law that has pervaded their papers.  Much of Defendants'
argumentation relies on the presumption that Plaintiff was doing
something wrong when he refused medication.  This cannot be
squared with <u>Rennie</u>, however, which holds that civilly committed
patients retain a liberty interest in refusing medication.  The
prudence of Plaintiff's decision to refuse medication does not
bear on the issues in this case.

Complaint makes no further mention of Haynes.  The Second Amended
Complaint appears to be self-contradictory, however.  In ¶ 14, it
says that the State Defendants are being sued only for injunctive
relief, while in ¶ 68(c), it says the State Defendants are being
sued for compensatory and punitive damages.  The confusion is
compounded, first, by a footnote in a brief filed by Plaintiff,
which contends that Haynes is "being sued for his failure to
fulfill his role as 'Rennie Advocate'" (Pl. Opp'n Br. 39 n.9),
and second, by Plaintiff's Response to Defendants' Statement of
Material Facts, which, citing ¶ 68(c) of the Second Amended
Complaint, asserts that "Haynes is being sued in his
individual capacity for money damages" (Pl. Ctr-Stat. Mat. Fcts.
3, ¶ 1).  As far as the Court can tell, the Second Amended
Complaint does not mention the particular allegation Plaintiff
raises in the brief's footnote, nor does it make any individual
capacity claim against Haynes.

      The distinction between individual and official capacity
claims amounts to much more than a mere technicality.  "[A]n
official-capacity suit is, in all respects other than name, to be
treated as a suit against the [State].  It is not a suit against
the official personally, for the real party in interest is the
[State]." Kentucky v. Graham, 473 U.S. 159, 166 (1985)
(citations omitted).  Since the Amended Complaint names Haynes
only in his official capacity, Plaintiff may not prosecute a

claim against him for damages.  <u>Edelman v. Jordan</u>, 415 U.S. 651,
666-67 (1974).  Furthermore, since Plaintiff is no longer a
patient at Ancora, he lacks standing to seek injunctive relief
against Haynes, for the reasons discussed above.  <u>See</u> <u>Lyons</u>, 461
U.S. at 111.  The Court therefore dismisses without prejudice all
claims against Haynes.  If Plaintiff wishes to raise an
individual capacity claim against Haynes, he must seek leave to
amend the Second Amended Complaint pursuant to Federal Rule of
Civil Procedure 15(a)(2).[34]

**V. Conclusion**

For the reasons explained herein, the Court denies
Plaintiff's motion for partial summary judgment, and, in part,
grants Defendants' cross-motion for summary judgment.

For clarity, the Court has determined that there exist
genuine issues of material fact for trial as to the February 10
non-emergency approval of involuntary drug administrations, in
particular, whether Monte deviated from standards of professional
judgment and whether the treatment team members failed to provide
an independent and impartial review.

The Court has reserved on the question of whether the Ancora
Defendants are qualifiedly immune from litigation of the claim

---

[34] If Plaintiff seeks leave to amend, and if the Court
grants leave, the new claims raised will, of course, be subject
to qualified immunity and any other basis for summary judgment
Defendants may assert.

that they medicated Plaintiff pursuant to the Emergency Procedure in the absence of a genuine emergency and contrary to standards of professional judgment.  This matter can be resolved only with further findings of fact.

Finally, the Court, <u>sua</u> <u>sponte</u>, has dismissed without prejudice all of Plaintiff's claims against the State Defendants, including Defendant Haynes, for lack of standing to seek injunctive relief, but will allow Plaintiff 30 days to rehabilitate these claims by establishing, by written submission, that he does have standing to assert these claims.

s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

Dated: January 29, 2009